UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

NADRA ENZIAYA; DONALD L. CHOPIN;
KATHERINE D. LAGARRE; RONALD MORRISON;
NORMAN L. OAKS; FRAZER L. O'HARA; ROBERT S.
O'HARA; MALIK RAHIM, Plaintiffs

CIVIL ACTION

NO. 11-2977

VS.

SECTION "I-3"

MITCHELL J. LANDRIEU;
RONAL SERPAS; and
CITY OF NEW ORLEANS;
    Defendants

J. LANCE AFRICK

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**I.   Introduction**

Plaintiffs ask this court to issue a preliminary injunction extending for the next 90 days the Temporary Restraining Order (TRO) issued by Judge Zainey.   Plaintiffs are members of the Occupy New Orleans movement which speaks and advocates and lives out a commitment for equality and justice and democracy in our local, state, federal and global communities.   At great personal sacrifice, they have been occupying Duncan Plaza, a public park in the middle of the City of New Orleans.   Their actions embody the freedom of expression, freedom of speech and freedom of assembly of the First Amendment to the U.S. Constitution.   Defendants seek to limit the First Amendment rights of protesters by enforcing simple park curfew regulations.   Park regulations are not the compelling interests which can outweigh the core freedoms of the First Amendment which are entitled to vigorous protection by the judiciary.   In this

memorandum, plaintiffs outline why they seek and are entitled to the vigorous protection of the First Amendment.

## II. Preliminary Injunction

Plaintiffs' Motion for TRO and associated Memorandum in Support of that Motion are fully incorporated herein.  The legal standard for issuance of a Preliminary Injunction is discussed in Plaintiffs' Motion for TRO.  As with the TRO, all factors militate in favor of Plaintiffs.  Plaintiffs respectfully request that the TRO be extended as a Preliminary Injunction allowing Plaintiffs to remain in Duncan Plaza subject to the extensive restrictions already set in place with the TRO that cured any credible concerns Defendants have raised regarding public health and safety issues.

## III. OccupyNOLA

The Occupy movement, including OccupyNOLA, expresses a desire for a just, equitable, and conscious society.  This movement seeks to build more cohesive and respectful communities that welcome all including the working poor and homeless. OccupyNOLA explains its vision:

> OccupyNOLA  is a people-powered movement that began on October 6, 2011 in Duncan Plaza, across from City Hall OccupyNOLA is fighting back against the corrosive power of major banks and multinational corporations over the democratic process, and the role of Wall Street in creating an economic collapse that has caused the greatest recession in generations. The movement is inspired by popular uprisings in Egypt and Tunisia, and aims to expose how the richest 1% of people are writing the rules of an unfair global economy that is foreclosing on our future.[1]

Throughout the U.S. South, Occupy movements have grown including in:  Austin, Texas Chattanooga, TN, Dallas Fort-Worth, Texas, Gainesville, FL, Houston, Texas, Knoxville, TN, Miami, FL, Nashville, TN, Oklahoma City, OK, Orlando, FL, San

---

[1] OccupyNOLA, http://occupynola.org/?page_id=135 (last visited Dec. 8, 2011).

Antonio, Texas, Talahassee, FL. OccupyNOLA has been connected to these movements and has sought to express a unified message.

One way that the Occupy movement has aimed to realize a collective vision is by living together in Duncan Plaza in community. Using tents for sleeping and as for meetings, music and art performances, poetry readings, and discussions, Plaintiffs and participants in OccupyNOLA have sought to build a community. To build its movement, Occupy has made widespread use of social media such as facebook, twitter, internet sites, and texts; the use of these mediums has lit the fire that has brought so many together worldwide. The Occupy movement is happening both physically in the streets, in parks such as Duncan Plaza, and in the digital world that connects participants in far-flung locations. It is important to understand this context of the Occupy movement because it represents a new chapter for social movements and grassroots organizing for justice that looks quite different from previous civil disobedience actions in the U.S. The Occupy movement utilizes both a cyber-presence and a physical presence to connect communities.

### A. OccupyNOLA Has Been Maintained Peacefully with Permission of the City

OccupyNOLA has utilized Duncan Plaza since October 6, 2011 and during that time, the City has not raised concerns with the leadership or Occupy's attorneys regarding significant problems. To the contrary, after welcoming participants into Duncan Plaza when Mayor Landrieu personally visited OccupyNOLA in the early days of its arrival, the City has continued to allow Occupy participants to utilize the central pavilion for shows and gatherings and to erect tents throughout Duncan Plaza. OccupyNOLA participants and attorney Miles Swanson remained in contact and

discussions with City attorneys through this period; Defendants did not raise issues with public health or safety, indicate that permitting was required, or demand changes with OccupyNOLA.

Defendants had never (until after it destroyed OccupyNOLA) indicated that the Duncan Plaza space needed to be made available for use by other parties; Plaintiffs would be agreeable to sharing Duncan Plaza. Defendants have never provided detailed information about requests for use of Duncan Plaza by other parties. In any case, Occupy spaces around the country have been used simultaneously for the Occupy movement and other purposes. Moreover, the public continues to use Duncan Plaza as a thoroughfare.

It is true that homeless people have joined with OccupyNOLA at Duncan Plaza. It is widely recognized that there are simply inadequate shelter beds for all homeless people in the Greater New Orleans area. Some homeless people have joined the community at Duncan Plaza as a way to find a place to sleep and store possessions. *See* Declarations, Exhibits. Others homeless people have celebrated and join in the message of OccupyNOLA around societal inequities that homeless people understand so well. *Id*. Some homeless are youth. *Id*. Given that homeless people sleep outdoors in parks and other locations throughout the Greater New Orleans area, the homeless people in Duncan Plaza with OccupyNOLA, including Plaintiffs, are being singled out and censored by being forcibly removed and prevented from living and sleeping with OccupyNOLA at Duncan Plaza simply because they seek to express a message and live in the OccupyNOLA community. Homeless people were not able to find shelter after being evicted from OccupyNOLA and were left on the cold streets without a place to sleep or a

4

place to go including those with physical and mental disabilities.  *See* Declarations, Exhibits.  They lost their belongings and critical papers.  *Id*.

### B. Defendants Destroyed OccupyNOLA to avoid Federal Court Jurisdiction and Caused Significant Property Damage

Only when Plaintiffs filed this Motion for TRO/PI and after the TRO had been scheduled for hearing before a federal judge, did Defendants decide that the OccupyNOLA camp was so unsafe that it was required to be destroyed in the darkness while participants were sleeping.  Defendants decimated the entire OccupyNOLA community just hours prior to the scheduled TRO hearing in this court.

Defendants failed to notify Plaintiffs' counsel or the court of the scheduled camp demolition after the TRO hearing was scheduled despite the fact that Plaintiffs' attorneys spoke with counsel for defendants and with the Court in the afternoon and on the evening of December 6, 2011 after the suit and TRO papers were filed.  Plaintiffs' counsel gave Defendants their cell phone numbers and requested to be contacted if the status quo was going to change in advance of the hearing.  No calls were ever placed to Plaintiffs' counsel.  Defendants also had discussions with Judge Zainey's and Judge Africk's chambers to schedule the TRO hearing.  Prior to destroying OccupyNOLA, Defendants failed to present any notice or information orally or in writing to this Court on reasons for the immediate wholesale destruction of the camp.  Without notice to Plantiffs' attorneys, the NOPD moved in and pushed OccupyNOLA participants out.  To no avail, Plaintiffs' attorneys personally spoke with a prominent City attorney in the predawn hours outside of the OccupyNOLA site while NOPD was destroying the OccupyNOLA camp and requested that NOPD's actions cease pending outcome of the federal court hearing.

The irony of this pre-dawn destruction raid is that Defendants actions illustrated exactly what the Occupy movement has been protesting—that those with the power in this country act as if the rules that are supposed to apply to everyone else do not apply to them. In trying to avoid the judicial process and taking this matter into its own hands under cover of darkness, Defendants disregarded the processes and procedures that are the foundation of the rule of law in this country. The irony continues as Defendants vigorously seek to enforce a curfew, a relatively mild local regulation, while apparently not placing much importance on the U.S. Constitution nor the U.S. Judicial system.

After suit was filed, after counsel for the city was notified the court was being asked for a TRO, indeed after the TRO was scheduled by the court and known by the city, after Defendants under cover of darkness destroyed Occupy NOLA, actually even after the TRO was being heard, the city produced affidavits from its employees about health and safety concerns.

Defendants' justifications for their actions should be taken with more than a grain of salt.

Just one example will suffice. As one stated justification for termination of the protest, Defendants have alleged that over $50,000.00 has been spent to maintain OccupyNOLA. While the stated amount was far lower in discussions with the court on December 7, 2011, no documentation of this alleged spending has been offered. Where specifics have been disclosed, the alleged spending is questionable. For example, one representative of defendants was quoted in the local paper saying that $1,000.00 a week was being spent on toilets in Duncan Plaza. As one condition of the TRO, Plaintiffs were required to provide toilets at Duncan Plaza. Plaintiffs' did rent two toilets, with cleaning,

for just $163.50 per week.[2]  *See* Receipt, Doodie Calls, Exhibits.   In light of Doodie Calls, suspicion is warranted.

As a result of Defendant's unauthorized destruction of OccupyNOLA, Plaintiffs and others OccupyNOLA participants suffered widespread property destruction totaling a significant dollar amount.  *See* Declarations, Exhibits.  Some were not allows sufficient time to retrieve or return for their possessions and were told to leave the site immediately.  *Id*.  Some were still working the night shift when this raid occurred and had no chance to save their tent and possessions.  *Id*.  NOPD came in large numbers and moved tents while participants were still sleeping inside.  *Id*.  Some were told they must leave and were not allowed to take their tent and property.  *Id*.  Property Loss was extensive and includes loss of medication, text books, cameras, laptop computers, tents, blankets, furniture, food, cooking apparatus, personal documents including social security and medical cards, essential items for livelihood, clothing, coats, watches, and more.  *Id*.  NOPD purposefully smashed possessions and destroyed personal property.  *Id*.  NOPD did not allow those in OccupyNOLA to move their friends' tents and assist friends in order to save personal property.  *Id*.  Defendants' actions also cause widespread emotional distress especially to disabled and vulnerable participants with OccupyNOLA.  *Id*.  Some had to seek medical attention for the stress and panic that this caused.  *Id*.

**IV.  Importance of the First Amendment as Applied to OccupyNOLA**

Peaceable assembly is "of the people."  It is an exercise of retained sovereignty in a government of limited powers.  This follows from the Declaration of Independence, the

---

[2] Times Picayune, OccupyNOLA Ousted Later Reinstated in Hectic Day (Dec. 7, 2011), http://www.nola.com/politics/index.ssf/2011/12/occupy_nola_ousted_later_reins.html

structures of limited government set in place by the Constitution, and the 9th and 10th amendments. As the Supreme Court has said, "[i]n our system, sovereign powers are delegated to the agencies of government, but sovereignty itself remains with the people, by whom and for whom all government exists and acts," *Yick Wo v. Hopkins,* 118 U.S. 356 (1886).

This is an essential part of freedom and cannot be limited except by compelling state interest that rises far above a public park time regulation. "[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions, and have profound unsettling effects as it presses for acceptance of an idea. *That is why freedom of speech . . . is . . . protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest*. . . . There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups." *Terminiello v. Chicago,* 337 U.S. 1, 337 U. S. 5 (1949) (emphasis supplied).

The Occupy encampment in Duncan Plaza has been nothing if it has not been people gathered to consult for the common good. What is going on in Duncan Plaza is an exemplary exercise of sovereignty retained by the people. If people are coming from all over to deliberate with others about public affairs this means they will occupy some substantial chunk of time and space. People cannot seriously consult on issues of any

8

significance without gathering in a place and staying there.  Of course conflicts with other uses will arise.  But these must be first of all substantial and real and, secondly, they must be adjusted with respect for the public exercise of retained sovereignty implied, not by treating those gathered as merely demonstrators exercising an individual right.

Peaceable assembly to consult for the common good is not reducible to mere protest and message.  It is an exercise of power retained by the people.   As such it is an exercise of the people's sovereignty.   It takes place in public space because people without means have nowhere else to go but the public forum.  It is an exercise of the power of the public.  No doubt there must be good faith adjustment with local, state, or federal authorities regarding the accommodation of different and conflicting uses of property.  No doubt also where there is a clear and present danger of harm, steps can be taken.  But such approaches are very different from the regulations presented as rationale by defendants for stopping the people.

OccupyNOLA's participants' expressions of the possibility of a more democratic, just, and economically egalitarian society in a traditional public forum, Duncan Plaza—a park in New Orleans—exemplify political speech, which falls squarely within the guarantees of freedom of speech, assembly, association and the right to petition the government protected by the First Amendment.  *See* Declarations, Exhibits.

The protections of the First Amendment extend far beyond literal speech, and include symbolic communicative conduct in any of myriad forms, including the forms of expression used by Plaintiffs like constructing shelters and camping overnight. Plaintiffs constructed shelters, in this case tents, which are symbolic of their message that there is a possibility to create a more democratic, just, and economically egalitarian

9

society. Tent cities like the one in Duncan Plaza have been built across the country, from the Occupy Wall Street site in New York City to Oakland, California on the West Coast, to communicate this message. Anyone viewing the OccupyNOLA tent city is very likely to know that it represents the message of hope for a more democratic, just, and economically egalitarian society. Further, by sleeping in a public park in a "round-the-clock vigil," Plaintiffs are expressing their political message in a manner recognized as speech protected under the First Amendment.  Plaintiffs know what their conduct communicates, and observers of that conduct are likely to understand the message, so it is protected under the First Amendment.

**V.   International Human Rights Norms Demand Tolerance for This Protest**

The world knows the U.S. spoke out against governments in Egypt, Libya, Syria and other places as they tried to push protestors out of Tahir Square and other public places.  The U.S. repeatedly called on foreign governments to protect the human rights of protestors involved in the Arab Spring.  Plaintiffs ask that government officials in the US respect and guarantee the human rights to freedom of speech and assembly for those protesting in Duncan Plaza just as if they were in Tahir Square.

This part of the memorandum will briefly explain what human rights laws are at issue and what international human rights monitors are seeing in the U.S.  U.S. constitutional protections for freedom of assembly are underscored and amplified by human rights laws which the U.S. has ratified.   Human rights law applies directly and specifically to the activities of the defendants.   Indeed, an official United Nation official monitor of global human rights has publicly expressed serious concern about the way

Occupy protests are being shut down by local authorities and interfering with these human rights.

### A. Importance of Freedom of Assembly Underscored by U.S. Treaty Affirming Assembly as a Protected Human Right

The U.S. Constitution protections in the First Amendment for peaceable assembly are enhanced by looking to human rights laws, which highlight the importance of the right to peaceable assembly. This is extra important right now, as December 10 is Human Rights Day, a day when people the world over will be celebrating the 63rd anniversary of the Universal Declaration of Human Rights.  Article 20 of the Declaration promises: "Everyone has the right to freedom of peaceful assembly and association."

Further, the right to peaceably assemble is protected by the International Convention on Elimination of all forms of Racial Discrimination, (CERD), Article 5 which states: "State Parties undertake…to guarantee the right of everyone, without distinction…the right to freedom of assembly and association [and] the right of access to any place or service intended for use by the general public, such as…parks."  CERD has been specifically mentioned by the US Supreme Court.  In the 2003 decision upholding academic affirmative action, Justice Ginsburg in a concurrence joined by Justice Breyer, pointed out the importance of the International Convention on the Elimination of All Forms of Racial Discrimination. *Grutter v. Bollinger*, 539 U.S. 306 (2003).

As indicated by the U.S. Supreme Court, the U.S. ratified ICERD in 1994.  As a ratified treaty, it is according to Articles III and VI of the US Constitution, part of the "supreme law of the land."

International human rights law, available through agreements like CERD, is explicitly included as part of US law by reason of two provisions of the US Constitution.

11

Article VI, Section 2 says: "This constitution, and the laws of the United States which shall be made in pursuance thereof; *and all treaties made*, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding."  Article III confers on federal courts jurisdiction over cases involving treaties: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, *and Treaties made*, or which shall be made, under their Authority." (emphasis supplied).

Plaintiffs do not ask for a separate cause of action under international law for the disruptions of the right of peaceful assembly by defendants.   But plaintiffs do ask this court to consider the importance of the rights of the plaintiffs in light of these international human rights.

### B. Special Rapporteur

The international human rights community is officially watching how the Occupy protestors are being treated.  In 1993, the United Nations Commission on Human Rights established the mandate of the Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression.  Currently the UN Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression is Frank La Rue of Guatemala.

Mr. LaRue has stated publicly last week that crackdowns against Occupy protestors in the USA appear to be violating the protestors' human and constitutional rights.  "I believe in city ordinances and I believe in maintaining urban order.  But on the other hand I also believe that the state – in this case the federal state – has an obligation

to protect and promote human rights.  If I were going to pit a city ordinance against human rights, I would always take human rights."[3]

### VI. Inadequate Notice was Given to Participants and Application of any Municipal Statute is Unconstitutional Because It Does Not Leave Open Ample Alternative Channels for Communication

Defendants argue that they gave notice to OccupyNOLA participants by distributing hundreds of flyers that referenced the Municipal Code.  *See* Exhibits, City Notice.  The portion of the Municipal Code that is referenced in the City Notice is squarely inapplicable. City Code Sec. 106-139, referenced in the Notice is as follows:

> The department of recreation shall work in close cooperation with the city planning commission and shall clear all plans for the development of new areas and facilities through the planning commission for its approval.

That portion of the Municipal Code by it plain language has nothing to do with park hours as the notice states.  Specifically, the City's Notice uses this portion of the code to indicate that "it is a violation of the law to remain in Duncan Plaza from 10:30 pm to 6:00 am."  This is flatly incorrect according to the City's own Municipal Code.

Thus, no participants could have fairly been given notice of the law with this paperwork given that the Defendants cited to an incorrect portion of their own Municipal Code.  Defendants might claim a clerical error given that City Code Sec. 106-138 provides that public playgrounds are restricted during this time period.  However, this argument falls flat.  The essential aspect of any notice in order for it to comply with a bare modicum of due process and justice is that it must at least reference the applicable law it seeks to enforce.  This was not the case here.

---

[3] Dan Froomkin, "U.N. Envoy: US Isn't Protecting Occupy Protestors' Human Rights," December 2, 2011, Huffington Post.  Available online at: http://www.huffingtonpost.com/2011/12/02/occupy-wall-street-un-envoy_n_1125860.html

13

Moreover, under the Municipal Code, the Department of Parks and Parkways shall administer, control, and manage all parks. City Code Sec. 106-65. No Notice to vacate has ever come to Plaintiffs from this City Department.

The second portion of the Municipal Code referenced in the Notice is also not squarely germane. City Code Sec. 146-276 states:

> It shall be unlawful for any person to construct or maintain or operate any structure or service on, above or beneath the public streets and other public places within the city without permission of the council in accordance with the regulations provided in this article. Providers of wireline telecommunications services, as that term is defined in section 30-45 of this Code, shall be governed by sections 30-43 through 30-57 of this Code.

That portion of the code is inapplicable here because Plaintiffs had obtained permission to utilize tents and other equipment in Duncan Plaza. For more than two months, Defendants gave permission to OccupyNOLA. Moreover, a tent utilized for sleeping is quite different from a "structure" under this section of the Code, which refers to something much more permanent than temporary shelters used for gathering and sleeping that currently exist at OccupyNOLA. The tents can easily be moved according to Defendants' preferences for location within Duncan Plaza. Notably, there is no prohibition in the Municipal Code against having leashed pets.

Furthermore, no local ordinance trumps the First Amendment and exercise of First Amendment rights is not limited to day-time hours. Thus, constraint on all overnight exercise of First Amendment rights is not a reasonable restriction. There are absolutely ways to narrowly tailor any restriction here for OccupyNOLA participants. Defendants seek to ban all overnight protests in all parks throughout New Orleans. It is unclear that this kind of overnight park ban has previously been enforced; it is neither reasonable nor narrowly tailored as applied here. Plaintiffs have selected the nighttime

hours as a critical time for their protest and message in coordination with others from around the South and beyond.  Defendants' regulation of Plaintiffs' overnight speech when others sleep outdoors around the City for other purposes and because they are homeless amounts to impermissible regulation of Plaintiffs in violation of the First Amendment.

In *Meyer v. Grant*, the United States Supreme Court found an ordinance which prohibited the circulation of petitions to be unconstitutional because it violated "appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for doing so." 486 U.S. 414, 424 (1988).

Any public health and safety issues that Defendants now raise through submission of affidavits and/or other documentation are inapposite because the conditions referred to no longer exist at OccupyNOLA.  After all, Defendants completely destroyed the OccupyNOLA site, cleared all of Plaintiffs' and others' personal property, and power washed the entire area. *See supra*. IB.  What remains now are approximately 15 tents where protesters are living and sleeping under conditions imposed by this Court to cure an public health and safety concerns with the granting of the TRO.  First Amendment concerns for this smaller OccupyNOLA community in Duncan Plaza are paramount.

The use of an ordinance to regulate OccupyNOLA participants' expression of protected speech in a traditional public forum is unconstitutional because it does not leave an ample alternative channel through which OccupyNOLA participants can express their message.  The use of an ordinance to regulate OccupyNOLA participants' expression of protected speech is also contrary to the purpose of the local code.  There is

15

no portion of the local code including those portions which Defendants have referenced in the notice and their papers, which limit application of the First Amendment.

The tent city and occupation of Duncan Plaza, including the use of direct democracy as an exemplar government, communicates Occupy NOLA's message of the possibility of a more just, democratic, and economically egalitarian society as no other manner of communication can.  *See* Declarations, Exhibits.  Marching, giving speeches, or holding up signs cannot adequately communicate that message, because those forms of expression do not demonstrate an occupation or literally show what a more just, democratic, and economically egalitarian society might look like.  Prohibiting the use of a tent city through trespass and unlawful assembly laws is unconstitutional here because there is not an ample alternative for expressing OccupyNOLA's message.

## I. CONCLUSION

To the extent that Defendants have any remaining concerns about location of tents, disposal of waste, noise, and the presence of homeless people who have no other place to live and sleep in the Greater New Orleans area, Plaintiffs remain ready to discuss with Defendants alternatives for other parks and vacant spaces for Plaintiffs' peaceful around the clock protest and request that this Preliminary Injunction be granted to allow such discussions.

For all of the reasons set forth above, Plaintiffs' respectfully request that the Court grant Plaintiff's Motion for Preliminary Injunction.

Dated:  December 9, 2011					Respectfully submitted,

/s/ Davida Finger_____
William P. Quigley, La. Bar Roll No. 7769
Davida Finger, La. Bar Roll No. 30889 (T.A.)
LOYOLA UNIVERSITY NEW ORLEANS
COLLEGE OF LAW
Stuart H. Smith Law Clinic & Center for Social Justice
7214 St. Charles Ave, Box 902
New Orleans, LA 70118
Tel: (504) 861-5596
Fax: (504) 861-5440
Email: dfinger@loyno.edu

Miles Swanson, La. Bar Roll. No. 32053
4000 Bienville St., Ste. A
New Orleans, LA 70119
(504) 383-4335 office
(504) 482-6171 facsimile
mws@mwswanson.com

## CERTIFICATE OF SERVICE

I certify that a copy of this pleading was served on undersigned counsel for defendants in compliance with the Rules of Civil Procedure via ECF.

Date:  December 9, 2011                              /s/Davida Finger_____